PER CURIAM.
We have for review a referee’s report recommending that Respondent Brian Gerard Doherty be found guilty of professional misconduct and disbarred. Doherty has petitioned for review of the report, challenging the referee’s recommendations as to guilt, as well as the recommended sanction. We have jurisdiction. See art. V, § 15, Fla. Const.
The disciplinary case against Doherty arises from ethical violations that occurred during Doherty’s representation of an elderly client to whom he provided both legal and financial investment services. The referee in this matter recommended that Doherty be found guilty of violating the following Rules Regulating the Florida Bar: 4 — 1.7(a)(2) (Conflict of Interest; Current Clients — Representing Adverse Interests) and 4-1.8(a) (Conflict of Interest; Prohibited and Other Transactions — Business Transactions With or Acquiring Interest Adverse to Client), and disbarred. The Court previously entered an order in this case approving the referee’s findings of fact, recommendations as to guilt, and recommended sanction, and disbarring Do-herty from the practice of law in Florida. See Fla. Bar v. Doherty, No. SC10-3S2, 2012 WL 149337 (Fla. order entered Jan. 17, 2012). This opinion follows.
FACTS
The Florida Bar filed a disciplinary complaint against Respondent Doherty, alleging that he violated several of the Rules Regulating the Florida Bar. A referee was appointed. The referee held evidentiary hearings and has submitted his report for the Court’s review, in which he makes the following findings and recommendations.
Doherty was first admitted to practice law in Massachusetts and New Hampshire in 1978. He was admitted to The Florida Bar in 1987 and eventually moved his practice to this state. In addition to his law practice, Doherty has a background as a financial advisor, and he provides financial planning and investment services to clients.
In 1994, Doherty began a professional relationship with the client and her hus *445 band. Originally, Doherty was hired only to provide financial services; Doherty was licensed in Florida to sell certain investment products, particularly annuities. Beginning in 2004, however, he also performed legal work for the couple. In June 2006, the client’s husband died. Following her husband’s death, the client continued to engage Doherty’s legal and financial services. Earlier that year, the client was diagnosed with cancer. Accordingly, she asked Doherty to help her make a number of changes to her investments and estate planning documents.
At the time her husband died, the client owned six annuity products. In an effort to simplify her investments, she asked Do-herty to reduce the number of annuities she owned from six to three. On July 16, 2006, Doherty submitted applications to purchase three annuities from Conseco Insurance Company (Conseco). The referee found that Doherty would have earned a ten percent commission on the sale had it been completed. However, on July 28, Doherty withdrew the applications. On August 1, 2006, he submitted applications to purchase three annuities from Washington National Insurance Company (Washington National), a subsidiary of Conseco. The referee found that Doherty would have earned a seven percent commission on the Washington National annuities. The referee also found that the client would have received an eight percent premium bonus from the purchase of the Washington National annuities, a bonus that would have vested at the time of the sale.
Notably, at the time these transactions took place, Doherty owed Conseco $86,370.54. The referee found that Doherty’s debt had come about due to “charge-backs,” meaning that Conseco was attempting to recapture certain commissions it paid to Doherty because his clients (the purchasers of the annuities) had died within a specified period after the annuity was issued. To satisfy the debt, in March 2006 Doherty and Conseco negotiated a settlement agreement. Pursuant to the agreement, Doherty was required to pay Conse-co $10,000 toward the total debt, as well as fifty percent of any commissions he earned selling Conseco products. If Doherty made no commissionable sales within a six-month period, the entire debt would become due in full and payable on demand.
As noted, Doherty would have received a commission on the sale of Conseco or Washington National annuities to the client. In either case, Conseco would apply fifty percent of the commission to reduce Doherty’s debt pursuant to the settlement agreement. Moreover, while the Conseco annuities would have been subject to a charge-back, such that Conseco would have sought to recover the commission if the client died within one year of the sale, the Washington National annuities did not have a charge-back provision and Doherty’s commission would have fully vested upon consummation of the sale. By this time, it was evident that the client’s health was declining. Indeed, the referee found that Doherty took steps in an attempt to eliminate or reduce the negative consequences that would have resulted if the client died within a year of purchasing the annuities. Ultimately, the client died on August 19, 2006, before any annuity sale could be completed.
In addition to her investments, in the last several weeks of the client’s life Do-herty worked to revise her estate planning documents. On August 10, 2006, the client executed a new will. Pursuant to this will, the full value of her estate passed to an existing trust (the Restated Trust). This would have included the Washington National annuities, had the sale been accomplished. The client named Doherty as her personal representative. She also execut *446 ed amendments to the Restated Trust to name Doherty as successor trustee. He was given final and uncontestable authority to determine whether certain estate planning methods the client effectuated were successful.
Doherty also authored two new trusts for the client’s estate. The first, a real estate trust, was executed on August 10, 2006. The primary asset in the trust was to be the client’s condominium unit. The trust instructed that the unit be sold and the proceeds from the sale used to purchase annuities. Doherty was named the successor trustee for the real estate trust and was granted sole discretion to select the annuities that would be purchased. Significantly, the referee found that Do-herty’s authority to sell financial products was limited to Conseco or Washington National annuities. The second trust at issue, an educational trust, was also executed on August 10, 2006. It was established to pay future educational expenses for the client’s grandchildren. Doherty was named the successor trustee for the educational trust. However, following the client’s death, the beneficiaries of her estate filed a challenge to Doherty’s appointments as personal representative and successor trustee. He was eventually removed from those positions.
With respect to each of the transactions at issue, the referee found that Doherty assumed “multiple, concurrent yet discreet [sic], professional roles in behalf of [the client], i.e., estate planner, trustee and successor trustee of a number of trusts, financial products salesperson, personal representative, and attorney.” However, the referee also found that Doherty did not provide the client with any written document to advise her of his multiple and conflicting positions. Accordingly, the referee recommended that Doherty be found in violation of two bar rules: 4-1.7(a)(2) (a lawyer shall not represent a client if there is a substantial risk that the representation of the client will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person, or the lawyer’s personal interests) and 4-1.8(a) (a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless the transaction is fair and reasonable to the client, the client is advised in writing of the desirability of seeking independent legal counsel, and the client gives informed, written consent to the essential terms of the transaction).
The referee found four factors in aggravation: (1) Doherty has a prior disciplinary history, including a two-year suspension in New Hampshire; (2) he acted with a selfish motive; (3) he refused to acknowledge the wrongful nature of his misconduct; and (4) he had substantial experience in the practice of law. The referee did not find any mitigating factors. In fact, the referee specifically rejected Doherty’s arguments that he made a timely good faith effort to rectify the consequences of his misconduct and that he was cooperative during the disciplinary proceedings.
Based on the referee’s recommendations of guilt, as well as his findings in aggravation, the referee recommended that Doherty be disbarred. The referee also awarded costs to the Bar.
As noted, Doherty has filed a petition seeking review of the referee’s report and recommendations. Doherty does not challenge the referee’s recommendation that his conduct violated rule 4 — 1.7(a)(2). Thus, we approve that recommendation without further discussion. Doherty does argue that the referee’s recommendation that he be found guilty of violating rule 4-1.8(a) is not supported. He also challenges the referee’s recommended sanction of disbarment.
*447 ANALYSIS
Rule 4-1.8(a). Doherty first challenges the referee’s recommendation of guilt with respect to rule 4-1.8(a). To the extent Doherty disputes the referee’s findings of fact, the Court’s standard of review for evaluating a referee’s factual findings is as follows: this Court’s review of such matters is limited, and if a referee’s findings of fact are supported by competent, substantial evidence in the record, this Court will not reweigh the evidence and substitute its judgment for that of the referee. Fla. Bar v. Frederick, 756 So.2d 79, 86 (Fla.2000); see also Fla. Bar v. Jordan, 705 So.2d 1387, 1390 (Fla.1998). To the extent he challenges the referee’s recommendation as to guilt, the Court has repeatedly stated that the referee’s factual findings must be sufficient under the applicable rules to support the recommendations as to guilt. See Fla. Bar v. Shoureas, 913 So.2d 554, 557-58 (Fla.2005).
Rule 4-1.8(a) provides as follows:
(a) Business Transactions With or Acquiring Interest Adverse to Client. A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, except a lien granted by law to secure a lawyer’s fee or expenses, unless:
(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer’s role in the transaction, including whether the lawyer is representing the client in the transaction.
The facts clearly demonstrate that Doherty failed to make the specific written disclosures required by subdivisions (a)(1), (a)(2), and (a)(3). However, Doherty raises a threshold issue. That is, he contends that his involvement in the sale of annuities to the client was not a “business transaction” and thus the disclosure requirements were not triggered. We do not agree. We hold that the sale of annuities to a client in the context presented here is a business transaction and Doherty was required to comply with rule 4-1.8(a).
At the outset, Doherty argues that rule 4-1.8(a) requires the referee to find that he engaged in a business transaction with a client and that he acquired a pecuniary interest adverse to his client. This argument is without merit. Rule 4-1.8(a) clearly states that a lawyer “shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client.” (Emphasis added.) A plain reading of this language indicates that a lawyer’s involvement in a business transaction with a client would itself constitute a violation of the rule unless the lawyer makes the required disclosures. It is not necessary for the referee to also find a violation of the adverse interest clause. See Fla. Bar v. Herman, 8 So.3d 1100, 1105 (Fla.2009) (“[Rule 4-1.8(a)] prohibits two broad categories of conduct: (1) entering into a business transaction with a client; or (2) acquiring an ownership, possessory, security, or other pecuniary interest adverse to a client.”).
Next, Doherty asserts that the sale of an annuity is not the type of “business transaction” that falls within rule 4-1.8(a). He maintains that in brokering the annui *448 ties he played no principal role in the transaction — the seller was Washington National and the buyer was the client. Doherty contends that he had no interest in the annuity policy and no ability to affect the client’s rights therein. However, we conclude that rule 4-1.8(a) is not so limited in its scope and application.
Although the language of rule 4-1.8(a) does not identify the types of transactions to which the rule applies, the comment to the rule provides guidance. The comment states:
A lawyer’s legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property, or financial transaction with a client. The requirements of subdivision (a) must be met even when the transaction is not closely related to the subject matter of the representation. The rule applies to lawyers engaged in the sale of goods or services related to the practice of law. See rule 4-5.7.[1]
(Emphasis added.) As the referee observed, the comment suggests that rule 4-1.8(a) encompasses a scope of dealings broader than simply those between a lawyer and his or her client as the principals to the transaction. Indeed, this Court has disciplined lawyers under rule 4-1.8(a) for engaging in a variety of business transactions with their clients. See, e.g., Herman, 8 So.3d 1100 (finding a violation of rule 4-1.8(a) where the lawyer invested in a company in direct competition with his client’s corporation); Fla. Bar v. Ticktin, 14 So.3d 928 (Fla.2009) (finding a lawyer in violation of rule 4-1.8(a) where the lawyer took over his client’s role as chairman and CEO of the client’s corporation); Fla. Bar v. Kramer, 593 So.2d 1040 (Fla.1992) (finding a lawyer in violation of rule 4-1.8(a) where the lawyer loaned his client money, secured the loan by instructing the client to execute a deed granting certain property to the lawyer, and failed to disclose the actual nature of the transaction to his client).
We have also considered guidance from the American Bar Association (ABA). The ABA’s Model Rule of Professional Conduct 1.8(a) (Conflicts of Interest: Current Clients: Specific Rules) closely parallels rule 4-1.8(a). Like the Florida rule, Model Rule 1.8 provides that a lawyer shall not enter into a business transaction with a client unless the terms of the transaction are fair and reasonable to the client and are fully disclosed in writing; the client is advised in writing as to the desirability of seeking independent legal counsel; and the client gives his or her informed, written consent. The comment to Model Rule 1.8(a) indicates that the rule “applies to lawyers engaged in the sale of goods or services related to the practice of law, for *449 example, the sale of title insurance or investment services to existing clients of the lawyer’s legal practice.” (Emphasis added.)
At least one other state has reached the same conclusion that we do here — that a lawyer providing financial planning services to a client is subject to the rule prohibiting a lawyer from engaging in a business transaction with a client unless the lawyer makes the required disclosures in writing. In Stark County Bar Association v. Buttacavoli, 96 Ohio St.3d 424, 775 N.E.2d 818 (2002), the Supreme Court of Ohio sanctioned an attorney who engaged in misconduct similar to that found in this case. In Buttacavoli as in this case, the lawyer was both a practicing attorney and a financial planner and consultant. Id. at 819. A client, a sixty-five-year-old man, hired Buttacavoli to provide estate planning and financial advice. Buttacavoli prepared a will for the client and advised the client to invest funds in a variable annuity. Id. Although Buttacavoli stood to receive a $8,491.71 commission from the sale of the annuity, he did not disclose to the client his own financial interest in the advice he gave. Id. at 819-20. A panel of the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court found that Buttacavoli’s conduct violated the Ohio Code of Professional Responsibility DR 5-101(A)(l) (1996) (absent full disclosure and consent, employment shall not be accepted if the exercise of professional judgment will be or reasonably may be affected by the lawyer’s financial, business, property, or personal interest) and DR 5-104(A) (absent full disclosure and consent, a lawyer shall not enter into a business transaction with a client if they have differing interests therein and the client expects the lawyer to exercise his professional judgment for the protection of the client). Id. at 820. Specifically, the panel determined:
[T]he legal and financial advice was part of an integrated transaction requiring full disclosure of respondent’s financial interest in the investment transactions and informed consent by the clients based upon such full disclosure. Moreover, the panel found that in respondent’s role as attorney, his legal advice could reasonably be affected by his financial interest in the investment advice he offered.
Id. The Ohio Supreme Court adopted the panel’s recommendation.
Like the respondent in Buttacavoli, Do-herty held himself out as a lawyer and a Certified Financial Planner. His professional relationship with the client involved both legal work, including amending her will and executing two trusts on her behalf, and financial services, namely brokering the sale of Conseco and Washington National annuities. It is clear that Doherty stood to earn a commission from the sale of the annuities had those transactions been completed. It is also clear that he did not disclose his financial interest in the transactions to the client in writing as required by rule 4-1.8(a). Accordingly, we approve the referee’s recommendation that Doherty be found guilty of violating rule 4-1.8(a).
Sanction. Doherty next argues that the referee’s recommended sanction, disbarment, is too harsh. He urges the Court to disapprove the referee’s recommendation and, instead, impose a public reprimand.
In reviewing a referee’s recommended discipline, our scope of review is broader than that afforded to the referee’s findings of fact because, ultimately, it is our responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. However, generally speaking this Court will not second-guess the referee’s recommended discipline as *450 long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
The evidence demonstrates that Doherty’s conduct created a clear conflict of interest in that there was a substantial risk that his representation of the client would be limited by his own interests. Doherty acted purposefully to make his personal, pecuniary interests at least as important as those of his client and her estate. He advised his client to select various means of estate planning and wealth management that would earn him a personal financial benefit. Additionally, Doherty participated in a business transaction with his client and failed to disclose his substantial interest in the transaction. We believe his actions amount to egregious misconduct.
The Court has often imposed lengthy suspensions in cases where a lawyer’s personal interests created a conflict of interest and in those where a lawyer engaged in a business transaction with a client. See, e.g., Fla. Bar v. Roberto, 59 So.3d 1101 (Fla.2011) (suspending the respondent for one year where the evidence showed that the lawyer’s personal interests created a conflict of interest); Fla. Bar v. Jasperson, 625 So.2d 459 (Fla.1993) (suspending the respondent for one year where the evidence showed that the respondent, in an effort to cover up his failure to file a bankruptcy petition for his clients that would have prevented the foreclosure of their home, purchased the home from the clients to prevent the foreclosure sale moving forward). When the facts in a case show egregious misconduct, particularly where a lawyer acts with a selfish motive or fails to disclose a substantial financial interest, we have imposed significant terms of suspension. In Florida Bar v. Rodriguez, 959 So.2d 150 (Fla.2007), the respondent was a shareholder in a firm hired to represent a group of clients in an action against DuPont Corporation for damages allegedly resulting from the use of a DuPont product, Benlate. During settlement negotiations, the respondent learned that DuPont would not agree to a settlement unless it included a condition that the respondent’s law firm would not pursue any other cases against the company. Id. at 154. After researching the ethical issues involved, respondent’s law office determined that this objective could be achieved if DuPont became a client of the firm. Id. Later, DuPont entered into a secret engagement agreement with respondent’s firm, in which it agreed to pay the firm $6,445,000 in exchange for the firm’s agreement not to pursue future claims against DuPont and for possible future legal work. Id. at 155. At this point, the respondent became an agent of DuPont, and his allegiance to both DuPont and his Benlate clients created a conflict of interest. Further, the respondent and his firm placed their interests above those of the Benlate clients because, among other reasons, the firm stood to receive a significant amount of money. Id. In fact, the respondent received more than $4,700,000 from the arrangement. Id. at 156. The respondent also did not disclose the agreement to the trial judge, to his Benlate clients, or in later proceedings held in the case. The Court found the respondent in violation of numerous bar rules, including rule 4-1.7(a), and suspended him for two years.
Here, we have concluded that Do-herty engaged in egregious misconduct in that he advised his client to take specific actions that would earn him a financial benefit and failed to disclose this personal interest to the client. Moreover, in contrast to the facts of Rodriguez, the referee in this case also found four aggravating factors. Most significantly, Doherty has a *451 prior disciplinary history. In 1997, he was suspended from the Bar in New Hampshire for a period of two years. See In re Doherty’s Case, 142 N.H. 446, 703 A.2d 261 (1997).[2] In the New Hampshire case, Do-herty had agreed to represent two clients in a personal bankruptcy action. He accepted a $10,000 retainer for the representation. Despite the specific rules which required Doherty to disclose his acceptance of the funds and file a motion for court approval, Doherty deposited the money into his general office account without notifying the bankruptcy court and began using the funds for his own purposes. Later, the bankruptcy court ordered Doherty to disgorge the funds. He refused to do so for more than four years after the court’s order. The referee in this case found that Doherty’s conduct displayed a “disregard for the judicial process.”
In addition to his disciplinary history, the referee found that Doherty acted with a selfish motive; he refused to acknowledge the wrongful nature of his misconduct; and he has substantial experience in the practice of law. The referee also considered as aggravation evidence that Do-herty made false statements in applications for errors and omissions insurance policies, concerning his disciplinary history. Doherty refused to acknowledge the false statements in his testimony during the evidentiary hearing. The referee found that Doherty’s sworn denial reflected poorly on his character.
The referee did not find any mitigating factors. Doherty argues that the referee erred in failing to consider certain facts as mitigation. “Like other factual findings, a referee’s findings of mitigation and aggravation carry a presumption of correctness and will be upheld unless clearly erroneous or without support in the record. A referee’s failure to find that an aggravating factor or mitigating factor applies is due the same deference.” Fla. Bar v. Germain, 957 So.2d 613, 621 (Fla.2007) (citation omitted). The referee’s report indicates that he considered Doherty’s evidence and testimony but ultimately found that Doherty did not show any circumstances that would mitigate his misconduct. On review before this Court, Doherty has not presented any evidence that would demonstrate that the referee’s findings are clearly erroneous.
In sum, considering the serious nature of Doherty’s misconduct, his disciplinary history, and the aggravating factors, we conclude that disbarment is the appropriate sanction.
CONCLUSION
Accordingly, Brian Gerard Doherty has been disbarred. The disbarment took effect on February 16, 2012.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Brian Gerard Doherty in the amount of $8,787.80, for which sum let execution issue.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Rule Regulating the Florida Bar 4-5.7(a) states, "A lawyer who provides nonlegal services to a recipient that are not distinct from legal services provided to that recipient is subject to the Rules Regulating The Florida Bar with respect to the provision of both legal and nonlegal services.” In subdivision (b), the rule further states that "[a] lawyer who provides nonlegal services to a recipient that are distinct from any legal services provided to the recipient is subject to the Rules Regulating The Florida Bar with respect to the nonlegal services if the lawyer knows or reasonably should know that the recipient might believe that the recipient is receiving the protection of a client-lawyer relationship.” The comment to the rule explains that in some circumstances "the legal and nonlegal services may be so closely entwined that they cannot be distinguished from each other.” In such a case, the comment provides that rule 4-5.7 requires the lawyer to be responsible for "assuring that both the lawyer’s conduct and, to the extent required elsewhere in these Rules Regulating The Florida Bar, that of nonlawyer employees comply in all respects with the Rules Regulating the Florida Bar.”

. Doherty also received reciprocal two-year suspensions in Florida and Massachusetts. See Fla. Bar v. Doherty, 718 So.2d 171 (Fla.1998) (table). He was reinstated in Florida in March 2001. See Fla. Bar v. Doherty, 786 So.2d 581 (Fla.2001) (table).